IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


BRYANT V. BRYANT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


SARAH L. BRYANT, APPELLEE,

V.

JOHN T. BRYANT, APPELLANT.


Filed January 7, 2020.    No. A-19-224.


Appeal from the District Court for Madison County: JAMES G. KUBE, Judge. Affirmed in part, and in part reversed and remanded with directions.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, for appellant.

Joel E. Carlson, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellee.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

John T. Bryant appeals from the decree of the Madison County District Court that dissolved his marriage to Sarah L. Bryant. John challenges the district court's decision to award legal and physical custody of the parties' children to Sarah, its calculation of child support, and its award of alimony and attorney fees to Sarah. We affirm the district court's decision on custody, alimony, and attorney fees. However, we reverse and remand the issue of child support back to the district court with directions.

## II. BACKGROUND

John and Sarah were married in January 2015. They had three children together, a daughter (born in 2013) and two sons (born in 2014 and 2015). In addition, John had custody of his four children from a previous marriage and Sarah had custody of her three children from a previous marriage.

In July 2017, Sarah, pro se, filed a complaint for dissolution of marriage. Sarah asked that the parties be awarded joint legal custody of the children, but that she be awarded sole physical custody. Sarah asked that child support be awarded according to the guidelines, and for a fair division of parties' assets and debts. John did not file an answer or a counterclaim.

In an order filed on September 7, 2017, the district court awarded temporary custody of the children to Sarah, with reasonable rights of parenting time to John, which included every other weekend from 7 p.m. on Friday to 7 p.m. on Sunday, and 6 weeks in the summer; a holiday parenting time schedule was also established. No finding of child support was made at that time.

On October 10, 2017, Sarah, via an attorney, filed an amended complaint for dissolution of marriage. Sarah asked for temporary and permanent custody of the children, as well as temporary and permanent child support and alimony. She also asked for an equitable division of the parties' marital assets and debts, and to be awarded attorney fees and costs. Again, John did not file an answer or a counterclaim. No further temporary order appears in our record.

After a 2-day trial in October 2018, the district court entered its decree on February 14, 2019, wherein it dissolved the parties' marriage. The court awarded sole legal and physical custody of the parties' three children to Sarah, subject to John's reasonable rights of parenting time as set forth in an attached parenting plan. Pursuant to the parenting plan, John was to have parenting time every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday, and alternating weeks in the summer with exchanges to occur on Fridays at 6 p.m. A holiday parenting time schedule was also established. The court ordered that beginning on March 1, 2019, John was to pay Sarah child support in the amount of $1,821 per month for the parties' three children. John was also ordered to pay 85 percent of any work-related daycare expenses incurred by Sarah and 85 percent of any health care expenses for the children which are not covered by Medicaid. The court ordered John to pay Sarah alimony in the amount of $300 per month from March 1, 2019, through February 28, 2021. Additionally, John was ordered to pay $3,000 towards Sarah's attorney fees.

John appeals.

## III. ASSIGNMENTS OF ERROR

John assigns, consolidated, that the district court erred in (1) awarding sole legal and physical custody of the children to Sarah, (2) calculating child support, (3) awarding Sarah alimony, and (4) ordering him to pay $3,000 towards Sarah's attorney fees.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. CUSTODY

#### (a) Evidence at Trial

##### *(i) Parties' Testimony*

John testified that he and his ex-wife, Shana Bryant (Shana), were divorced in 2011 and he was awarded custody of their four children (born in 2000, 2003, 2006, and 2008). John and Shana's divorce decree and parenting plan were received into evidence and reveal that Shana had previously suffered a stroke and was not physically able to care for the children for significant amounts of "contiguous" time.

Sarah testified that she and John met in March 2012. Initially, he hired her to watch his four children while he was at work. A month later John and Sarah were involved romantically, and a month after that Sarah and her three children (from a previous marriage) moved in with John and his four children. At that time, the parties were living in Sutherland, Nebraska. John was working for Don Oppliger Farms, and Sarah stayed home with the seven children. Sarah stated, "It didn't take long before [John] was gone all the time." "He would come home maybe at 3:00 or 4:00 in the morning drunk, sleep for a couple of hours and then go to work. Or he wouldn't come home at all and then text me and say I'm at work now." Sarah testified that behavior continued throughout their relationship.

The parties' first child together was born during an unassisted home birth in 2013. During Sarah's labor, John left the house for several hours. According to Sarah, he showed up half an hour before the birth "completely drunk," "[w]as screaming at me to get the fuck out of his house," and to "[g]o drop my baby in a fucking field somewhere," "[g]o have the baby on the side of the road or in a field, he didn't care." Sarah left the house for a little bit, and after she came back she gave birth with John's help. Sarah said that when she was in labor, John told her that he was at his cousin's house. However, about a month later, Sarah found receipts from a restaurant in John's wallet and when she confronted him, he admitted he had been out with an ex-girlfriend when Sarah was in labor. According to Sarah, John said, "I've been fucking her the whole time. If you don't like it, you can leave." John testified that he was at a restaurant with his oldest daughter, not his ex-girlfriend, on the day Sarah was in labor, and then he went to his cousin's house; he left his cousin's when Sarah texted to say that she was having contractions. John denied consuming any alcoholic beverages that day; in fact, when asked about 2012 and 2013, John testified that "it was very rare" for him to consume alcohol. John also denied telling Sarah to get out of the house, and denied making comments about leaving the child in a field.

Sarah testified that her relationship with John was "hostile most of the time." "It was so typical for there to be screaming and yelling at me." When the parties' oldest child was 4 or 5 months old, Sarah and John starting fighting. She locked herself in the bedroom with the baby and one of her other children, because she wanted to get away from the fighting; John stood at the door

and "yelled and screamed and called me nasty names for about 15 minutes." During his testimony, John "[didn't] recall that ever happening."

Sarah testified that during 2013, there were four or five times that she would leave the parties' home and stay away for up to "a week or a week and a half." Sarah said "at least once a month" in 2013, John told her that if she tried to leave and take the baby, he would take the baby from her. "He said . . . 'I've already got my lawyer on standby and I will get custody of [our daughter], and they won't give you custody because you don't have money and you don't have anywhere to go if I kick you out of here.'" Sarah said the statements "scared [her] to death." Sarah had a community support worker and would "reach out" to find out what her options were. "I reached out for legal help," "[a]nd was just kind of told, you know, there's so many other cases with priority above yours, we can't help you."

In September 2013, Sarah found out she was pregnant again. She was "afraid" to tell John. When she did, he said, "'You're just a sneaky fucking whore. You did it on purpose. You think you're just going to end up getting more money out of me one day.'" However, John testified that when Sarah told him she was pregnant with their second child he was "a little stunned" and "caught . . . off guard," but he was "happy at the same time." He denied making comments or calling her any names.

Sarah stated that in November 2013, John quit his job and was unemployed. "He was angry all the time," was gone a lot, and was drinking every night. In January 2014, John and his four children moved to Johnstown, Nebraska, and he ended up going back to work for Don Oppliger, running a farm in Johnstown. John testified that he moved because Oppliger, the owner of the company, asked John to transfer to run a farm. According to Sarah, "Things were so bad between us, . . . there was no way we were moving together as a family at that point." Sarah drove from Sutherland to Johnstown regularly so that their daughter could see John and his other children. Sarah eventually moved to Johnstown in May. Within a few weeks, the parties' second child was born, and things were working out for a while. But then "[i]t was just back to the same behaviors." "We were fighting so bad and he was telling me on a daily basis, 'Get the fuck out of my house. I don't want you here.' And calling me all the same [profane and derogatory] names he always called me." On cross-examination, Sarah acknowledged that she "[s]ometimes" called John names too.

Sarah testified that on one occasion when John told her to leave, she was packing her clothes into a laundry basket and John "threw it down the hallway." Then when she was holding their two small children, he tried to grab the children from her, yelling that she was not going to take them if she left. "[T]hen he pushed me because he couldn't get the kids out of my arms." Sarah left the next morning. She met John at a cornfield where he was working so that he could say goodbye to their children. Sarah said that when she got there, he said goodbye to their daughter and then "slammed my van door and then immediately started yelling at me, calling me trailer trash, whore. Told me, 'I hope the kids grow up to hate you.'" Sarah said she put her vehicle in reverse and started to move, at which time he punched the passenger's side front window. When she texted him and told him she was going to "call the cops," he said, "'[W]hat for? You almost ran my foot over.'" On cross-examination, Sarah denied that she actually ran over John's foot and denied that John told her she ran over his foot. Sarah testified that she "called the sheriff immediately and went down to the sheriff's station and talked to them."

John's version of events was different. He testified that he and Sarah were both at the house talking that day. She was getting ready to head to Sutherland where her older children were and he had to go do some work. When Sarah arrived at his location, "[i]t wasn't cordial." John acknowledged he slammed the van door, but said "it was one of them doors that if you don't slam it hard enough it's not going to shut." When he was headed around to the other side of the vehicle, Sarah "screamed at me, 'Don't slam my F'ing door,' and she threw her van in reverse and backed over the top of my foot and I smacked her window and said, 'You run my foot over.'" John said there was a "tire print" on his left boot. "Deputy Kremer contacted me to ask me where I was at so he could come out and get a statement from me," and "I told him the exact same story."

Sarah testified that during the summer of 2014, there were several attempts to leave John, but she kept going back. A month or two after their older son's birth, Sarah contacted her community support worker in North Platte, Nebraska, and told the worker about the situation and that she could not be there any longer; the worker told Sarah there was a spot at the Rape and Domestic Abuse Protection shelter in North Platte. When Sarah told John she was going to leave, "he, in turn, told me that as soon as I left, his ex-girlfriend . . . was supposed to be moving in with him within a couple of days," and "he was going to fight me for custody, get our kids from me and she would be mom to them." Sarah and the children moved to the domestic violence shelter that July. She said that at that point, John told her he would sign away rights for their daughter and that it was better if their son did not even know him because John was "'such a terrible person.'" "He kind of played this, that he was the victim and everything. And I was a horrible person for leaving with our kids." Sarah and the children stayed at the shelter for 2 weeks, but she was in contact with John, who would be hurtful, but then turn around and "promise all these things." After about 2 weeks, Sarah ended up going back to John, and stayed with him for the remainder of 2014.

According to Sarah, "[D]epending on the day," "[t]here was name calling and yelling." There was a "big incident" in December 2014 when Sarah and John were arguing and John was yelling. Sarah decided to take the children for a drive, but as she was walking out the front door, John yelled, "'I told you you're not taking my vehicle,'" and ran after her. They got to the vehicle at the same time, "[a]nd he kind of shoved me out of the way with his shoulder and yanked the keys out of it and said, 'I told you you're not taking it. You're a fucking thief. I'm calling the sheriff and telling them you're trying to steal my vehicle.'" Sarah "immediately called a domestic violence advocate" that she had "been regularly meeting with," while at the same time John "was on the phone with the sheriff telling him I was stealing his vehicle." Sarah stated, "They came out and ended up escorting me to Ainsworth[, Nebraska, about 11 miles from Johnstown] to stay in a hotel for the night." She filed a protection order against John "the next day" and "it was granted." Sarah stated that she and her children stayed at a domestic violence apartment in O'Neill, Nebraska, for 2 weeks after that. During her time away, John publicly posted apologies on Facebook. Sarah said she felt guilty and contacted John, who said he wanted to marry her and would make everything right; Sarah then went back to John and asked for the protection order to be dropped.

Sarah married John in January 2015. According to her, "The first probably two months were really good." They were in marriage counseling together until early to mid-March, when John "refused to go" anymore. After that, their relationship "would be really bad for a few weeks and then it would be okay for a few weeks." In "early 2015," Sarah and the parties' two children

would ride with John while he worked. Sarah said that one time they were talking about the protection order and John "made the comment there's already a deep hole dug out here for a well. Nobody would find a body if I threw one in there. And then he looked into the back seat at [our children] and said, 'Mom better start acting right, huh?' And he would laugh"; "he said that at least three or four different times when we were riding with him." Sarah felt intimidated by the comment, but she stayed with John for the remainder of 2015. (When asked if he ever made any "threats" about "wells," John responded, "No.") The parties' third child was born later that year.

Sarah testified that in 2016, her relationship with John "was really on and off" and they talked about divorce that summer.

John testified that in July 2016, he got home and Sarah was sitting in the Tahoe and he could "smell the alcohol." After an argument, she tried to load the children in the Tahoe to leave, but John disabled it "[b]ecause she was intoxicated." The children went back into the house. He said that Sarah got in his work truck, "took off and almost hit one of the neighbors coming down the road." John called the sheriff's office. His oldest daughter had recorded the incident that night. Sarah acknowledged there was a recording wherein she told John's daughter to "get the fuck away from me." Sarah also acknowledged she was intoxicated that night, blew a .195 on a "PBT," and that the police transported her to a hotel that night. When asked if he had any issues with Sarah's consumption of alcohol besides that night in July, John responded, "She's been drunk on several occasions, slurring words, trying to start arguments as soon as she's been drinking. Can't hardly walk herself, let alone take care of children."

According to Sarah, a divorce action was filed in October 2016. Sarah found a place to live in Bassett, Nebraska, about 15 minutes from Ainsworth, and moved there with all six of her children. Sarah stated that during their separation, John (37 years old at the time) confirmed to Sarah that he was having a sexual relationship with a 19-year-old woman who was his daughter's best friend. John testified that he did not have a sexual relationship with the 19-year-old woman and that she was "a family friend."

Sarah also stated that during their separation, she had the parties' Tahoe (which John "was okay with"), but "then every time he would get angry at me, he would come in the middle of the night and take it away," although one time he left her his daughter's car. When there was no alternate vehicle left for her, she had to walk the children to school when "[i]t was freezing cold out." During his testimony, John acknowledged that there were times that he switched the Tahoe for another vehicle. When asked if he was aware at any point that Sarah was left with no vehicle to get the children to school, John responded, "No."

Sarah said that at the end of 2016, when she had an attorney to represent her in the divorce and was going to ask for custody and child support, "[John] did a complete turnaround and wanted to get back together." After a few weeks of talking, Sarah moved back to Johnstown. John testified that he ended up dismissing the 2016 divorce action because "[w]e ended up talking, working it out and trying to make the best of our marriage."

Sarah testified that in the early part of 2017, "things were okay," and then John's oldest daughter moved back into the house and she was "immediately . . . defiant," refusing to go to school (Sarah said the sheriff had to take her to school on a couple of occasions) and she "would just back talk and be completely rude." This caused a lot of problems between Sarah and John because Sarah "was left at home to deal with her and [John] was gone, but then on the other hand,

he would yell at me and get angry at me if I disciplined her." John testified that there was a difference in how Sarah treated his four children compared to the other six children. He said his oldest and youngest daughters were "constantly mistreated" by Sarah; "[t]hey were constantly yelled at, screamed at, cussed at."

Sarah said there was another incident in early 2017 when John came home and was yelling about the toys left in the yard. "John began screaming at me that I was worthless, I was stupid, I was dumb," and "in front of my kids told me I would be better off dead in a gutter and that I needed to get the fuck out of his house." After speaking with her domestic violence advocate, Sarah and her six children eventually moved to a shelter in Norfolk, Nebraska, in July and she started the current divorce proceedings; she also obtained a protection order against John.

Sarah testified that the 48 hours before she left John were the worst. When she told him she was leaving, he "was immediately angry." He joked with two of his daughters "about what a bitch and lowlife and worthless person and a shitty mother [sic] and I was just a gold digger," and John told one of his daughters, "'Watch this, she's going to go after me now for money.'" John testified that he and two of his daughters were "trying to stay away" and were "sitting [in the living room] talking and laughing," but it had "nothing to do with Sarah or anything." Sarah said that later that same evening, John "started stomping toward me and started rambling about, 'You think you're going to fuck up my job.'" Sarah said she had no idea what John was talking about, but "[h]is fists were clenched," and "[h]e just stomped down the hallway and ran his chest right into me"; Sarah "stumbled back and almost fell down." Two days later when she was getting ready to leave, John told their oldest son goodbye, and "then jumped in my face with his fists out like he was going to punch me in the face." When Sarah told John not to do that again, John started laughing and said, "You're such a dumb ass, you're such a stupid ass." Sarah acknowledged that John did not touch her, but that he did intimidate her. John denied that he ever raised his fists to Sarah.

John testified that the day Sarah moved out in July 2017, he had come home and "[Sarah] was screaming and yelling at me, making accusations." Sarah "[w]as constantly trying to get up in my face, shove me around." She called him names, "[d]ropping the 'F' word a lot," "[c]alling me a loser, a piece of shit," "[j]ust the typical stuff that . . . happened throughout our whole relationship."

John testified that "for the most part," Sarah was the one who started arguments during their relationship. "When she come [sic] out starting an argument, trying to instigate the argument, I would try to get away," "leave the house," "[g]o to work." On "several occasions" she would try to block me in a room and "yell and scream and cuss, shove me around." When asked if he had been the victim of any physical violence by Sarah, John responded, "Yes, I have." "Throughout our relationship it was constant. I mean, in most of the arguments that she started, her go-to was to grab one of the small babies in her arms and start shoving me into walls, punching me, hitting me, kicking me, screaming and yelling." When asked if he ever physically struck Sarah, John responded, "No." John acknowledged that Sarah would use derogatory names toward him during arguments, and he acknowledged that he had done the same. He agreed that they both contributed to the verbal "rockiness" of their relationship. On cross-examination, John acknowledged that in 2011, he was convicted for assaulting his then girlfriend's 21-year-old son.

Sarah said that she and the children have lived in Norfolk since July 2017. They moved out of the shelter and into a five-bedroom, one-bathroom, rental home in January 2018. Sarah testified that John has received all of his parenting time as prescribed in the temporary order. She stated that there had been times since the temporary order has been in place that exchanges (which occur at the sheriff's station in O'Neill) have not gone well. For example, during the summer of 2018, John went "right up to the officer and start[ed] yelling about how [I'm] a meth head, he's a meth head, pointing at [my boyfriend] and I [sic] while my kids are standing right next to him after I'm getting them out of my vehicle." John's comments about Sarah and her boyfriend being "meth head[s]" have occurred on more than one occasion and have occurred in front of the children "every time." However, John testified that Sarah has "caused quite a bit of scenes at our exchanges," "[s]creaming and yelling about if somebody was riding with me." "Getting the kids from her, she has on several occasions talked very poorly about me in front of the kids," for example "she's directly stated to them, 'I'm sorry you have to go with your deadbeat father'" and "[s]he's on several occasions called me an F'ing loser, and F'ing deadbeat," "[t]hings of that nature."

Sarah met her current boyfriend, Michael Schommer, at the end of 2017; they were officially dating in late January or early February 2018; and he moved in with Sarah and her children in late April. Sarah's relationship with Michael has "been amazing" and he is "great" with her children, "[t]hey love him" and "[h]e loves them." Sarah stated that Michael does have "a drug charge on his record" from "ten or eleven years ago" "from Texas." On cross-examination, she acknowledged she was aware that in 2009, Michael got 10 years of probation for manufacturing and delivery of a controlled substance, and that additionally in 2009, he got 4 years of probation for possession of a controlled substance. Sarah denied that Michael had been involved in criminal or drug activity since she had known him.

According to Sarah, in addition to problems at exchanges, there has been hostility in the parties' text and email conversations. And most of the times John "ignores" the texts she sends him about the children. She has been "trying" to coparent with John, but "it's been incredibly difficult."

Sarah testified that the parties' oldest child was currently 5 years old and in kindergarten, their middle child was currently 4 years old and in full-day preschool, and their youngest child was almost 3 years old and cannot start preschool until he is 3. Sarah was the children's primary caregiver while she resided with John. Sarah said that she did the entire bedtime routine with their three children, "baths, brush their teeth, pajamas, read their books," and she also cooked all the meals. During harvest and planting time, John would be gone from 6 a.m. to 11 p.m. or sometimes midnight. "Even the off hours, he was gone a whole lot living his own life"; he "liked to go on long day trips by himself." When John was home, "[h]e was watching TV or on his iPad."

However, John testified that during his marriage to Sarah, their roles with the children were "split up." "[W]e both took care of all the kids -- all the kids in the house. There was [sic] ten kids when we were together in the household. They were all taken care of by both of us." "The little ones, of course, had to have more attention so they were getting . . . fed by both of us, bathed, read to at nighttime and brushing teeth." During the "slow season," John worked from 8 or 8:30 a.m. and was off around 5 p.m.; and "everything revolves right there within a mile of the house." When

he got home he "would get attacked by the little ones and start playing with them," "[t]alking to them about what they did" that day.

Sarah's suggested parenting plan contemplated, similar to the temporary order, that she would be awarded primary custody and that John would receive parenting time every other weekend and half of the summer, although she wanted the district court to award the summer parenting time on a weekly rotating basis (as opposed to the 6 consecutive weeks he got under the temporary order). She also preferred to have legal custody because "[John's] not been willing to work with me on anything or find a way to come to a middle ground about things." Sarah believed her recommended parenting plan was in the children's best interests.

John testified that he lives in an eight bedroom, three bathroom home (owned by Oppliger). Living in the house with him were three of his children from his previous marriage (his oldest child had moved out), and then he has the parties' three children every other weekend pursuant to the temporary order. The parties' testimony differs on how often telephone calls occur with the children (and how well those calls go) when they are with the other parent. John wanted physical custody of the parties' children (with Sarah having parenting time every other weekend, rotating holidays, and half the summer), but believed the parties' could do joint legal custody.

### (ii) Other Witnesses

John's oldest daughter from his previous marriage testified that when John and Sarah lived together they would fight "[r]egularly" and that "Sarah most of the time" was the one who would start the fights. Both parties would use foul language in front of the children, but John's daughter never saw him strike Sarah. During arguments, Sarah would "sometimes" be intoxicated, "but my dad is not a drinker." John's daughter would "[v]ery much" like to see him have custody of the parties' children.

Richard McCuiston, John's friend of more than 30 years, testified that he was at John's home in Johnstown "[a]bout every other weekend from September through January" for deer hunting season. McCuiston would regularly get there before John got off work, but Sarah would be home. "I've smelled [vodka] walking in the door." There were times when McCuiston was suspicious that Sarah was intoxicated because of "the way she was slurring her words." During her rebuttal testimony, Sarah stated that McCuiston's testimony was "[a]bsolutely not" accurate with respect to smelling alcohol and her slurring words. McCuiston stated he was also present one time when John and Sarah were in an argument; "All I could hear was them yelling as I walked in the garage door and I seen her push John and then I walked in and she walked away." McCuiston has also heard John on the phone with Sarah, and could hear them arguing. McCuiston testified that based on his observations, John is "a good dad." McCuiston would like to see John have custody of the parties' children. On cross-examination, McCuiston acknowledged that he had messaged Sarah to tell her he was looking forward to being in court, and he acknowledged that he had texted her the following: "I can't wait until the day court comes around. I'll be front row watching you lie out your ass"; "Suck off the government a little bit more, go buy your vodka with your food stamps with your meth head boyfriend"; "Fuck you and your pathetic loser life you have."

John Harris, Sarah's ex-husband, testified that his divorce from Sarah was "very civil." She got custody of their three children, but they "have always been able to agree and share time with

the kids whenever possible." Harris stated that Sarah had always taken very good care of their children, "She's always been a wonderful mother." When asked if he had ever known her to have a drinking problem, Harris responded, "Absolutely not."

Antonia Martinez, Harris' ex-girlfriend, got to know Sarah when Martinez was dating Harris, and they have remained friends. Martinez testified that 5 or 6 years ago, she was called to the parties' home in Sutherland around midnight because they were fighting and Martinez was asked to come get the Harris children. When Martinez got to the parties' home, "Sarah was crying, asking me to take the kids because she didn't feel like they were safe there." "John Bryant was slamming doors, calling [Sarah] a whore and a bitch. Asking if she likes what she's got and at that point we just hurried and grabbed the [Harris] kids out and I don't know what happened after I left."

(b) District Court's Ruling

In the decree, the district court stated that McCuiston's testimony "was diminished when he admitted on cross-examination that he fully supported [John] and wants to see [John] get custody of the children." The court found that Sarah had been the primary care provider for the parties' children since their birth. The court also found:

It is undisputed that the relationship between the parties has been volatile and abusive. [Sarah] has outlined a series of aggressive behaviors exhibited against her, by [John], both before and after the parties were married. There has been a pattern of behavior whereby [John] would verbally abuse, intimidate and threaten [Sarah], and then later apologize which, at the time, was sufficient for [Sarah], who would then return to the relationship. At times, [John] would exhibit aggressive behaviors, including physical assaults and implications which would further place [Sarah] in fear for [sic] health, safety, and general welfare. . . . There were also instances to which [Sarah] testified where [John] would threaten [her] with taking the children away from her in the event of a divorce and that she would be left with nothing. There were also instances during the marriage when [John] would leave [Sarah] without a vehicle to drive, even though she had the children with her.

Interestingly, [John's] position is that [Sarah] is typically the aggressor when these altercations occur and that he was the one who was ultimately the victim of domestic abuse. However, the Court does not consider that to be the case. Certainly, it is reasonable to assume that this may have been the case, on occasion, but not to the extent to which [John] would like this Court to believe. . . .

Certainly, the marriage and the parties' relationship has not been mutually respectful or cooperative. *Neither party is blameless for the circumstance in which they and the children find themselves. However, the Court finds that the significant amount of abusive and controlling conduct has been perpetrated against* [Sarah] *by* [John]*, and that the minor children have also been exposed to and witnessed abusive treatment of their mother by* [John]*.*

(Emphasis supplied.) According to the court, both parties provide an adequate living environment for the children, "although neither party is perfect." The court also noted that each of the parties

- 10 -

expressed love for the children and a desire to be the custodial parent and to spend as much time as possible with the children.

The district court awarded Sarah sole legal and physical custody of the parties' minor children. John was to have parenting time every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday, and alternating weeks in the summer (with exchanges to occur on Fridays at 6 p.m.). A holiday parenting time schedule was also established.

### (c) Applicable Law

Keeping the evidence and the district court's findings in mind, we now consider the legal principles governing custody and parenting time matters.

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### (d) Did District Court Abuse Its Discretion?

John argues that awarding Sarah sole legal and physical custody of the parties' minor children was not in the children's best interests "based on [Sarah's] history of domestic violence, instability, and other factors." Brief for appellant at 29. John's argument is based, in part, on his contention that Sarah was the "instigator" of domestic violence in their relationship. *Id*. at 31. However, as noted by the district court, neither party was blameless. And the district court found that John was responsible for perpetrating a significant amount of the abusive and controlling conduct, and that the children were exposed to such conduct. Additionally, the parties' testimony was in contrast as to the parenting roles each assumed during their relationship. In light of the evidence presented, and giving deference, as we must, to the district court who heard and observed the witnesses, we cannot say the district court abused its discretion in awarding legal and physical

custody of the minor children to Sarah. When there is evidence favoring and disfavoring both parties, we defer to the trial court, and we see no reason to do otherwise in this case.

## 2. CHILD SUPPORT

### (a) Evidence at Trial

During the marriage, Sarah did not have outside employment, she was a stay-at-home mother "raising ten kids." In the summer of 2018, Sarah got a job at Norfolk Lodge & Suites. She worked full time over the summer when she did not have to find childcare. The parties' children were with John for "quite a portion" of the first part of the summer, and her older children were out of school and able to watch the parties' children when she was at work. Once the school year started, Sarah had to adjust her hours because the parties' youngest child "is at home with me and he had a really rough summer," "[i]t resulted in a lot of separation anxiety and I didn't want to stick him immediately into a daycare for two months." The parties' youngest child will go to preschool when he is 3 years old. At the time of trial, Sarah was earning $10.50 per hour and believed she could work approximately 25 hours per week. On cross-examination, Sarah acknowledged that she does not have any physical or mental disabilities that limit her ability to work. She also stated she "[v]ery sporadically" sells items online. Additionally, she acknowledged that once a month since January 2018, she has had cash deposits into her checking account (anywhere from $55 per month to $500 per month; but some of those "were paychecks" that she would go in and cash and then put the cash into her account). She did acknowledge that there were some months she "suppose[d]" she deposited $2,500 on top of her regular child support, but stated "I was working full-time."

John testified that he has been employed by Don Oppliger Farms since 2000. He earned approximately $100,000 per year. As noted previously, John had custody of his four children from a previous marriage. His divorce decree from Shana states that she was disabled and unemployed, and that she received social security benefits. Their divorce decree also states, "[John] receives supplemental social security benefits in the monthly amount of $129.00 for each of the minor children because of [Shana's] disability. [John] waived any additional child support from [Shana]"; the court specifically stated that there should be a deviation from the child support guidelines because of those facts, and no child support was ordered. In the current proceedings, John testified that the younger three children from his previous marriage currently live with him. His oldest daughter (18 years old) "moved out after she graduated," but John still supports her "as much as [he] can"; John has "helped her out with groceries," "given her gas," and paid her cell phone bill.

John and his attorney prepared various child support calculations as an aid to the district court which were received into evidence (exhibit 37). The court asked if the exhibit was a "Prochaska calculation," and counsel responded, "It is, Your Honor," "[i]t's a three-part off the bar association calculator." See *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998) (finding district court did not abuse its discretion when, in modifying child support obligation for father's first family, it made allowance for father's second family; support for each family should be determined after deduction for support for other family).

The first calculation, "Step One," was a "Basic Calculation Between Parties," and reflected a total monthly income of $8,319 for John and $1,733.33 for Sarah (this would reflect an annual income of approximately $100,000 for John, and a $10 per hour full-time wage for Sarah). In this

calculation, each party was attributed 2.5 exemptions, and John was not given credit for "Regular Support for Other Children." Each parent's final share of the support obligation for three children was $464 for Sarah and $1,766 for John.

The second calculation, "Step Two," was a "Hypothetical Calculation (Father and Current Spouse [Shana])," and reflected a total monthly income of $8,319 for John and $1,500 (tax exempt) for his ex-wife, Shana. At trial, John was asked if he was aware of how much disability income Shana receives, with his counsel noting they had listed $1,500 in the hypothetical calculation. John responded, "That's probably correct. The last I knew it was a little over $1,000, but I'm sure it's increased." In this second calculation, child support was determined based on support for John and Shana's four children. This calculation presumes that John and Shana were still providing regular support for their oldest daughter, whom John testified had "moved out after she graduated." John was attributed 2.5 exemptions and Shana none, and John was given credit for "Regular Support for Other Children" in the amount of $1,765.71 (this was equal to his final share of the child support obligation for his three children with Sarah in the step one calculation). Each parent's final share of the support obligation for four children was $576 (rounded to $488 for the basis subsistence limitation) for Shana and $1,625 for John.

The third calculation, "Step Three," was a "Calculation Between Parties," and again reflected a total monthly income of $8,319 for John and $1,733.33 for Sarah; and each party was again attributed 2.5 exemptions. However, in this calculation, John was given credit for "Regular Support for Other Children" in the amount of $1,625.22 (this was equal to his final share of the child support obligation for his four children with Shana in the step two calculation). By using the "Prochaska Three-Step Calculation" (exhibit 37) to account for John's obligation to support his other four children, each parent's final share of the support obligation for the parties' three children was $512 for Sarah and $1,421 for John.

### (b) District Court's Ruling

The district court noted that John asked the court to give him a credit for the four children he cares for from a prior marriage. However, the court noted that John's oldest daughter no longer lives in John's home and "[t]here was no testimony from [her] or [John] that [he] continues to financially support her while she lives apart from [him]." Citing to *Crawford v. Crawford*, 263 Neb. 37, 42, 638 N.W.2d 505, 509 (2002) (considering whether to deviate from child support guidelines based on order of support for subsequent child; "trial court must have before it the calculations and any worksheets used to determine the child support order for the subsequent child"), the court found that John "provided no evidence or documentation of the income of his former spouse or the extent of his financial obligation to support any or all of these children." The court denied John's request for a downward deviation of his child support obligation in the current case.

In its child support calculation, the district court utilized a wage income for Sarah "based on her testimony that she currently earns $10.50 per hour and works 25 hours per week, as a result of her caring for the minor children"; the total monthly income attributed to her was $1,138. The court noted the parties agreed that John's annual wage is $100,000, so that was the amount it utilized for his income; total monthly income of $8,319. Sarah was awarded the dependency exemption for the parties' middle child, and John was awarded the exemption for the other two

children (as long as he was current on his child support obligation). The court ordered John to pay Sarah child support in the amount of $1,821 per month for the parties' three children. John was also ordered to pay 85 percent of any work-related daycare expenses incurred by Sarah.

### (c) Applicable Law

The Supreme Court has stated:

> In general, child support payments should be set according to the Nebraska Child Support Guidelines. The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." Use of earning capacity to calculate child support is useful "when it appears that the parent is capable of earning more income than is presently being earned."

*Freeman v. Groskopf*, 286 Neb. 713, 720, 838 N.W.2d 300, 307 (2013). See, also, Neb. Ct. R. § 4-204 (rev. 2015). And Neb. Ct. R. § 4-204 (rev. 2008) allows a deduction for child support previously ordered for other children. Additionally, this court has previously stated:

> There is no precise mathematical formula for calculating child support when subsequent children are involved. See *Brooks v. Brooks*, 261 Neb. 289, 622 N.W.2d 670 (2001). Such calculation is left to the discretion of the court as long as the court considered the obligations to both families and the income of the other parent of the subsequent children. See *id.* Subsequent familial relationships vary widely from case to case. *Id.* When a deviation from the guidelines is appropriate, the trial court should consider both parents' support obligations to all children involved in the relationships. *Brooks, supra*. In considering the obligation to those subsequent children, the trial court should take into consideration the income of the other parent of these children as well as any other equitable considerations. *Id.* The specific formula for making such calculations is left to the discretion of the trial court, as long as the basic principle that both families are treated as fairly as possible is adhered to. *Id.* In other words, a trial court has discretion to choose if and how to calculate the deviation, but must do so in a manner that does not benefit one family at the expense of the other.

*Lasu v. Issak*, 23 Neb. App. 83, 95, 868 N.W.2d 79, 89 (2015).

### (d) Was There Abuse of Discretion?

John argues that the trial court should have imputed full-time employment to Sarah. He claims that Sarah "voluntarily downgraded her hours to 25 hours per week while the children were in school," that all of the parties' children except one are currently in school, and that that child "will be in school full time the following year." Brief for appellant at 25. He further contends that the parties' youngest child "could be taken to daycare to allow [Sarah] to work full-time." *Id*. While we understand John's position, we cannot say that the district court abused its discretion in utilizing a wage income for Sarah based on $10.50 per hour for a 25-hour workweek. Sarah has

always been a stay-at-home mother to the parties' children, and testified as to her reasons for not sending the youngest child to daycare at this time (e.g., his separation anxiety).

Sarah also argues that it "is not possible" for her to work full time because "most, if not all, of that wage would be eaten up by daycare costs." Brief for appellee at 15. This argument is not particularly persuasive since the divorce decree makes John responsible for a large percentage (85 percent) of any work-related daycare costs. Regardless, the district court was in the best position to weigh the evidence related to imputing full-time income to Sarah with the corresponding addition of higher daycare costs versus accepting Sarah's explanation for reducing her work hours during the school year and not incurring additional daycare costs. Notably, although the district court opted to use Sarah's actual income, this option also gave John the benefit of avoiding daycare costs for which he would have been primarily responsible. We find no abuse of discretion in the district court's decision to not impute full-time income to Sarah at this time.

John also argues that the district court erred when it did not take into consideration his children from his first marriage, and that the court incorrectly stated that no evidence was presented as to his ex-wife's income. The record shows that John had custody of and was supporting his children from his first marriage; he was not receiving child support from his ex-wife pursuant to their divorce decree. He did, however, provide testimony that "the last [he] knew," Shana's disability income was "a little over $1,000, but [he was] sure it's increased." See *Burgardt v. Burgardt*, 304 Neb. 356, 365, 934 N.W.2d 488, 495 (2019) (while documentary evidence may be more persuasive, it is not absolutely required; "[o]f course, a party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion"). John and his attorney also prepared various child support calculations as an aid to the district court which were received into evidence; the *Prochaska* calculations showed the support for each family after a deduction for the support for the other family (although John incorrectly attributed a full-time wage to Sarah). See *Crawford v. Crawford*, 263 Neb. 37, 42, 638 N.W.2d 505, 509 (2002) (considering whether to deviate from child support guidelines based on order of support for subsequent child; "trial court must have before it the calculations and any worksheets used to determine the child support order for the subsequent child"). Thus, John provided the evidence and documentation that the district court stated he did not provide. While it is possible the district court meant there was no "credible or persuasive" evidence, the language in the decree indicates only that "no evidence" was supplied.

Because the district court stated that John had "provided no evidence or documentation of the income of his former spouse [Shana], or the extent of his financial obligation to support any or all of the children from his first marriage," we reverse and remand the matter back to the district court to reconsider John's child support obligation in accordance with the principles cited above related to support for other children. As noted above, a trial court has discretion to choose if and how to calculate the deviation for child support, but must do so in a manner that does not benefit one family at the expense of the other. *Lasu v. Issak, supra*.

For the sake of completeness, we note our agreement with the district court's assessment that John's request for credit for the four children from his prior marriage is misleading; John's support of his oldest daughter from his first marriage is questionable, as the testimony was that she has moved out, and that he only "helped her out with groceries," had "given her gas," and paid her cell phone bill. Additionally, although not raised by either party or the district court, John's divorce decree from Shana states that John receives "supplemental social security benefits in the monthly

amount of $129.00 for each of the minor children because of [Shana's] disability." The supplemental social security benefits received by John should be considered on remand. See *Hartman v. Hartman*, 261 Neb. 359, 365, 622 N.W.2d 871, 877 (2001) (social security dependency benefits are not means-tested public assistance benefits within meaning of Child Support Guidelines and are subject to inclusion as "income derived from all sources"; "Social Security dependency benefits received on behalf of a child as a result of a custodial parent's disability should be included in the monthly net income of the parent whose disability resulted in the payment of dependency benefits rather than as a credit to the nondisabled parent").

### 3. ALIMONY

#### (a) Evidence at Trial

The parties began living together in 2012, were married in January 2015, and physically separated for the last time in July 2017. As acknowledged previously, John earns approximately $100,000 per year ($8,319 per month). Sarah was a stay-at-home mother during the parties' relationship and marriage. At the time of trial, she was earning $10.50 per hour and working 25 hours per week ($1,137.50 per month).

Sarah's expenses were approximately $3,330 per month; such expenses included $850 for rent, $650 for food, $300 for electricity, $275 for cell phones, $200 for attorney debt, $150 for vehicle gas, $100 for credit card debt, $100 each for clothing and medical expenses, and various other expenses like garbage, vehicle maintenance, home maintenance, children's activities, and entertainment. On cross-examination she acknowledged that some of the expenses were for her three children from her prior marriage; however, she also receives $896 per month in child support from her ex-husband. Sarah also acknowledged that her live-in boyfriend works and helps with expenses. Sarah agreed that even though this was not a lengthy marriage, she believed that John was in a much better economic situation than her. At some point, Sarah would "love to actually be an advocate for victims of domestic violence." She understands that might take a college education, which she does not yet have. It has "always been [her] plan" to pursue a college education in order to achieve that goal; she "think[s] a 2-year degree" is needed.

John testified about his monthly expenses. His home is owned by Oppliger and he does not have to pay rent. We note that this benefit was not a factor raised by the parties in considering child support. His monthly expenses include $700 for groceries, $200 for school activities, $500 for family activities, $1,500 for temporary child support, $300 for gas, $200 and $260 to $270 for vehicles and renters insurance, $500 for his pickup payment, $421 for his motorcycle payment, "[a] couple hundred" for vehicle maintenance," "300 some dollars" for cell phones, $300 for credit card, $500 for personal loans, and some medical and dental costs. This amounts to approximately $5,700 per month.

#### (b) District Court's Ruling

The district court acknowledged that this was not a "lengthy" marriage. However, during the marriage, John worked full time and Sarah stayed home "with not only their three children but [her] children from a prior marriage, and [John's] four children from a prior marriage." "It was agreed to by the parties" that Sarah would stay home and care for the 10 children during the marriage.

The district court stated that "[Sarah] provided no testimony as to whether she intends to obtain additional education in the future." However, Sarah's testimony above was that "[a]t some point" she wanted to be an "advocate for victims of domestic violence," and that a 2-year degree was needed. The court noted that Sarah "will be caring for the three minor children, ages 3, 4, and 5 for quite some time. No information was provided to the Court as to any potential job prospects that [Sarah] might have in the face of caring for these minor children." However, Sarah's testimony above was that she was able to work full time at the Norfolk Lodge & Suites during the summer when she did not need outside childcare.

The district court stated John earns approximately $100,000 per year, but that Sarah was currently only able to work part time earning $10.50 per hour, "mostly due to her continued care of the minor children and her inability to afford much more in daycare expenses." The court found that Sarah's "ability to earn a living and support herself has been severely limited due to the commitment she has to care for the minor children of the marriage." "There is definitely a disparity of income between the parties which may partially justify an award of alimony." And "due to the circumstances of the parties and the general equity of the situation," the court ordered John to pay Sarah alimony in the amount of $300 per month from March 1, 2019, through February 28, 2021.

### (c) Applicable Law

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.* See, also, *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (alimony reviewed de novo for abuse of discretion).

### (d) Was There Abuse of Discretion?

John argues that Sarah should not receive alimony because "the marriage was short in duration, the parties only resided as husband and wife for a period of two and a half years, and [Sarah] has adequate income." Brief for appellant at 26. He further claims that he was the one awarded all of the marital debt and that the assets awarded to him had no equity; however, these claims are not supported by the decree or the record before us. Although this marriage was short in length, based upon our review of the record, we cannot say the district court abused its discretion in awarding Sarah alimony of $300 per month from March 1, 2019, through February 28, 2021 (2 years).

### 4. ATTORNEY FEES

According to an affidavit for attorney fees received into evidence, Sarah's attorney charged her a reduced rate of $75 per hour for his work on the case; in the affidavit, Sarah's attorney stated that a reasonable rate was $175 per hour. Attached to the affidavit were itemized billing statements for the work Sarah's attorney had done. From January 20, 2018, through October 3, 2018, Sarah had incurred attorney fees and court costs in the amount of $5,010.23, and her attorney estimated

Sarah would incur an additional $1,500 in attorney fees for the 2-day divorce trial. Sarah agreed that based on her income and expenses, it is challenging for her to pay her attorney fees. She requested that the district court order John to pay for some or all of her attorney fees.

It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). The award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. See *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

The district court ordered John to pay $3,000 toward Sarah's attorney fees "[d]ue to the circumstances of the parties and the general equity of the situation." We cannot say the district court abused its discretion by ordering John to pay attorney fees to Sarah.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's decision on custody, alimony, and attorney fees. However, we reverse and remand the issue of child support back to the district court with directions.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.